IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEREK SCOTT WILLIAMS PLLC and DEREK SCOTT WILLIAMS REAL ESTATE LLC, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THE CINCINNATI INSURANCE CO.,<br><br>Defendants. | Case No. 20 C 2806 |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Derek Scott Williams PLLC operates a dental practice in Lufkin, Texas; Derek Scott Williams Real Estate LLC owns the property where the dental practice operates. The Court will refer to them collectively as Williams. Williams purchased a commercial property insurance policy from Cincinnati Insurance Co. for the period from July 14, 2019 through July 14, 2020. As relevant here, the insurance policy provided coverage for actual loss of business income under circumstances described in the policy.

As is widely known, as a result of the coronavirus pandemic, state and local governments nationwide have, at various intervals, issued orders suspending or limiting operations of non-essential businesses that interact with the public. On March 22, 2020, the governor of Texas issued an order postponing all elective surgeries and non-emergency medical and dental procedures. Williams complied with the order and did not resume normal business operations until May 4, 2020. This resulted in a loss of

business income.

Williams alleges that it made inquiry regarding to the insurance broker through which it purchased the Cincinnati policy. The broker advised that Williams should not file a claim. Williams further alleges that insurers, including Cincinnati, have made it clear that they do not intend to provide coverage for business interruption arising from the coronavirus pandemic. Williams has filed this lawsuit seeking a declaratory judgment that it is entitled to coverage under its policy.[1] It has sued on behalf of a putative class.

Williams contends that its losses are covered by both two provisions of its insurance policy: the business income provision, and the civil authority provision. Cincinnati has moved to dismiss Williams's claims for failure to state a claim, arguing that under the plain language of these provisions, neither of them covers Williams's losses. For the reasons stated below, the Court dismisses Williams's claim under the civil authority provision but declines to dismiss its claims under the business income provision.

**Factual background**

As indicated, Williams's insurance policy covers the period from July 14, 2019 through July 14, 2020. During that period. an outbreak of novel coronavirus infection that began in China spread worldwide, including to the United States. To date, over 500,000 Americans have died from the coronavirus disease, and a total of at least 28,000,000 in this country have been infected with the virus—a figure that likely is

---

[1] Cincinnati does not dispute that it is routinely denying coverage for claims like the one made by Williams and does not contend that an "actual controversy" under the Declaratory Judgment Act is lacking.

significantly understated due to the absence of universal testing.

In its complaint, filed in May 2020, Williams alleges, citing World Health Organization reports, that the virus "is primarily transmitted from symptomatic people to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces." Compl. ¶ 20. Williams further alleges that transmission can occur from persons who are infected with the disease who are pre-symptomatic or asymptomatic. *Id.* ¶¶ 21-22. Williams also alleges, citing reports in scientific journals, that coronaviruses can remain infectious on inanimate surfaces at room temperature for up to nine days and that "contamination of frequently touched surfaces is a potential source of virus transmission." *Id.* ¶ 23. The Court cites these allegations not to adopt their accuracy or completeness, but simply to describe the allegations in Williams's complaint.

Williams alleges that the pandemic and containment efforts led civil authorities to issue orders closing non-essential business establishments and mandating social distancing. It alleges that state governmental authorities have also issued orders "prohibiting the performance of non-urgent or non-emergency elective procedures and surgeries, which has forced the suspension of procedures at many medical, surgical, therapeutic, and dental practices." *Id.* ¶ 26. In Texas, as noted earlier, Williams alleges that the state's governor issued an order on March 22, 2020 that postponed "all elective surgeries and non-emergency medical and dental procedures." *Id.* ¶ 27. Williams says that this prevented it from conducting normal business operations through May 4.

Williams contends that it is entitled to coverage under two separate provisions of the Cincinnati policy: the business income provision, and the civil authority provision.

3

The business income coverage provision under DSW's insurance policy reads as follows:

> We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at "premises" which are described in the Declaration and for which a "Business Income" Limit of Insurance is shown in the Declarations. The "loss" must be caused by or resulting from a Covered Cause of Loss. . . .

Dkt. no. 33-1, p. 47 of 55.[2] The term "loss" is defined as follows: "Loss means accidental physical loss or accidental physical damage." Dkt. no. 33-1, p. 55 of 55. (In other words, the term "loss" is used to define itself.) The term "period of restoration" is defined as follows:

> "Period of restoration" means the period of time that:
>
> a.    Begins at the time of "direct loss".
>
> b.    Ends on the earlier of:
>
>     (1)    The date when the property at the "premises" should be repaired, rebuilt or replaced with reasonable speed and similar quality; or
>
>     (2)    The date when business is resumed at a new permanent location.
>
> …

Dkt. no. 33-1, p. 55 of 55.

The "civil authority" coverage provision reads as follows:

> When a Covered Cause of Loss causes direct damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:

---

[2] The term "Covered Causes of Loss" is defined to mean "direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part." Dkt. no. 33-1, p. 11 of 55.

4

> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and
>
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.
>
> Civil Authority coverage for "Business Income" will begin immediately after the time of the first action of civil authority that prohibits access to the "premises" and will apply for a period of up to 30 consecutive days from the date on which such coverage began.
>
> Civil Authority coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the "premises" and will end 30 consecutive days after the date of that action; or when your Civil Authority coverage for [sic] "Business Income" coverage ends, whichever is later.

Dkt. no. 33-1, p. 48 of 55.

Cincinnati contends there is no coverage under either provision. Its principal argument regarding the business income coverage is that physical *alteration* to the property is required, and there is none. Contamination via coronavirus, Cincinnati contends, does not constitute damage to an insured's property because it can be removed by cleaning. Cincinnati's principal argument regarding the civil authority coverage is that access to Williams's property has not been prohibited but rather has been limited, which Cincinnati contends is insufficient to trigger coverage.

## Discussion

On a motion to dismiss for failure to state a claim, the Court takes the plaintiff's factual allegations as true, draws reasonable inferences in the plaintiff's favor, and assesses whether the plaintiff has asserted a plausible basis for relief. *See, e.g., Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015) (citing *Ashcroft v. Iqbal*,

5

556 U.S. 662, 679 (2009)).

The first question involves the applicable law. Because this case is in federal court by way of diversity jurisdiction, the Court applies the choice-of-law rules of the forum state, Illinois. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 478, 496 (1941). Under Illinois law, construction of an insurance policy is typically governed by the location of the subject matter; the place of delivery of the contract; the domicile of the insured or the insurer; the place of the last act giving rise to the contract; the place of performance; or other places having a rational relationship to the contract. *Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 166 Ill. 2d 520, 526-27, 655 N.E.2d 842, 845 (1995). In this case the insured property is in Texas; the insurance policy was delivered to Williams there; Williams is a Texas entity, whereas Cincinnati is an Ohio corporation. Cincinnati argues that Texas law applies, and Williams does not dispute this.

The Court will therefore apply Texas law to the parties' contract interpretation dispute. That said, in their briefs and arguments both sides have freely cited cases applying other states' law, likely because there does not appear to be an appreciable difference between the law of Texas and that of other states on the key contract interpretation principles involved. In addition, there is no controlling Texas authority on the particular policy points that the parties dispute here.

The Court will discuss the business income coverage term first and the civil authority term second.[3]

---

[3] This case, of course, does not stand alone in assessing an insurer's coverage obligations for business interruption related to the coronavirus pandemic. Each side has cited numerous cases supporting its position on the points at issue. These cases

1.    **Business income coverage**

Cincinnati's primary argument on the business income provisions is that there is no coverage because Williams has alleged no facts indicating that its DSW's property was physically altered. Cincinnati contends that the term "direct loss" requires a physical loss, which it contends means a physical alteration of the insured's property. Nothing like this is alleged, Cincinnati argues, and as a result Williams is not entitled to coverage.

Insurance contracts are interpreted according to the same principles that govern contract interpretation generally. *See Utica Nat'l. Ins. Co. v. Am. Indem. Co.*, 47 Tex. Sup. Ct. J. 845, 141 S.W.3d 198, 202 (Tex. 2004). The primary goal is to give effect to the parties' written expression of their intent. *Balandran v. Safeco Ins. Co. of Am.*, 41 Tex. Sup. Ct. J. 1153, 972 S.W.2d 738, 741 (Tex. 1998). A court "must read all parts of the contract together, striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative." *Id.* (citation omitted); *see also, e.g., Lynd Co. v. RSUI Indem. Co.*, 399 S.W.3d 197, 199 (Tex. App. 2012).

If, after applying these rules, a contract is subject to two or more reasonable interpretations, it is ambiguous. *See, e.g., Balandran*, 972 S.W.2d at 741. With an insurance contract, the interpretation of an ambiguous provision that favors the insured, if reasonable, is adopted, "even if the construction urged by the insurer appers to be more reasonable or a more accurate reflection of the parties' intent." *Id.* (quoting *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991).

---

go both ways, with more favoring insurers than insureds. But none of them are controlling here. The Court has considered all of the cited cases, but it will not string-cite them, either as supporting or contrary authority.

Cincinnati's contention that the term direct loss requires physical damage to the insured's property runs afoul of these principles of construction. Specifically, even though the term loss is defined in the policy to mean *either* physical loss *or* physical damage, Cincinnati contends that it requires physical damage. This interpretation writes the term "loss" out of the definition, which contradicts the basic principle that "each word [in a contract] has some significance and meaning." *Gates v. Asher*, 154 Tex. 538, 531, 280 S.W.2d 247, 249 (1955); *see also, Choice! Power, L.P. v. Feeley*, 501 S.W.3d 199, 206 (Tex. App. 2016). More specifically, a court presumes that when different words are used together, they have different meanings, in other words, that they are not redundant. *Gulf Metals Indus., Inc. v. Chicago Ins. Co.*, 993 S.W.2d 800, 805 (Tex. App. 1999). In short, "loss"—as used in the policy definition that "Loss means accidental physical loss or accidental physical damage"—cannot simply mean "damage."

It is, perhaps, easier to say what loss *does not* mean than what it does mean. One problem is that the policy uses the term "loss" to define the term "loss." But the Court is persuaded that **a** reasonable factfinder could find that the term "physical loss" is broad enough to cover, as Williams argues, a deprivation of the use of its business premises. That's the common meaning of loss, *see* "Loss," *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/loss (last viewed Feb. 28, 2021), and there is no basis to believe that the Cincinnati policy uses the term any differently. In this regard, the Court agrees with its colleague Judge Edmond Chang, who recently concluded exactly this in assessing very similar insurance policy language. *See In re: Society Ins. Co. COVID-19 Bus. Interruption Protection Ins. Litig.*, MDL No.

2964, Case No. 20 C 5965, 2021 WL 679109, at *9 (N.D. Ill. Feb. 22, 2021).[4]

Cincinnati makes two additional arguments to the contrary. The first, found in its brief, involves the business income coverage's reference to the "period of restoration." As quoted earlier, business income coverage extends through the "period of restoration," defined as the date when the insured's property "should be repaired, rebuilt or replaced," or the date "when business is resumed at a new permanent location," whichever is earlier. Cincinnati argues that the text of these references makes it clear that "loss" requires a physical alteration—otherwise why the reference to repairing or replacing? "Repair," however, is not inherently physical; one need only consider common references to repairing a relationship or repairing one's health. *See* "Repair," *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/repair (last viewed Feb. 28, 2021). In a situation like the one at issue here, the "loss" would be "repaired" if and when orders by governmental authorities permitted full use of the property. *See In re Society Ins. Co.*, 2021 WL 679109, at *9 (concluding that "[t]here is nothing inherent in the meanings of [the] words [repair or replace] that would be inconsistent with charactering the Plaintiffs' loss of their space due to the shutdown orders as a physical loss.")

Cincinnati's final point on this issue is not made in its brief but was made at oral argument. The Court sets aside the question of forfeiture and will deal with the point on its merits. Cincinnati seems to contend that "loss to" property means something different from "loss of" property (the Court notes, in this regard, that the Society

---

[4] Also like Judge Chang, given the Court's reading of the policy's "loss" term, it need not determine whether, as Williams contends, it has also adequately alleged physical "damage" to its property. *See In re Society Ins. Co.*, 2021 WL 679109, at *8 n.5.

9

Insurance policy language assessed by Judge Chang uses the phrase "loss of"). The Court acknowledges that the words are different, but this begs the question of what "loss to" property means. At best for Cincinnati, it's poor English that makes the term ambiguous—which does not help Cincinnati in the present situation, given the principle that ambiguities in insurance policies are typically construed against the insurer. That aside, Cincinnati cites nothing authoritative or persuasive that would indicate that "loss to" an insured's property includes only physical damage that deprives the insured of the use of the property. And finally, Cincinnati's reading is simply another way of attempting to read the terms "loss" and "damage" as meaning the same thing, which they plainly do not under the terms of this policy, which expressly defines the term "loss" as including both.

For these reasons, the Court concludes that Williams's claims regarding the business income coverage state viable claims upon which relief may be granted.

**2.     Civil authority coverage**

The Court reaches a different conclusion regarding Williams's claim under the civil authority coverage term. Cincinnati makes multiple arguments against coverage, but the Court need only deal with one: the contention that Williams has not alleged that "[a]ccess to the area immediately surrounding the damaged property is *prohibited* by civil authority . . . ." Dkt. no. 33-1, p. 48 of 55 (emphasis added).

Here the dispute involves the meaning of the term "prohibited." The common meaning is to forbid or prevent. *See* "Prohibit," *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/prohibit (last viewed Feb. 28, 2021). Williams's complaint concedes that did not happen in its case: it alleges it was

10

precluded only from conducting elective and non-emergency dental procedures, not from non-elective, emergency procedures. Thus there was no "prohibit[ion]." Williams argues that the restriction still constitutes a *partial* prohibition, but that's essentially an oxymoron. In this regard, the Court (again) agrees with Judge Chang in the *In re Society Insurance* case, in which he concluded that similar claims by restaurant owners had to be dismissed given their concession that access to their property by employees and others was permitted for limited ongoing operations—in that case, take-out sales and limited in-person dining. *In re Society Ins. Co.*, 2021 WL 679109, at *10.

## Conclusion

For the reasons stated above, the Court dismisses count 3 of plaintiff's complaint (concerning the "civil authority" coverage term) but otherwise denies defendant's motion to dismiss [dkt. no. 32]. Defendant is directed to answer the remaining claims by no later than March 22, 2021. The case is set for a telephonic status hearing on March 5, 2021 at 9:05 a.m. to set (or reset) a schedule for further proceedings. The following call-in number will be used for the hearing: 888-684-8852, conference code 746-1053. Counsel should wait for the case to be called before announcing themselves. The parties are directed to confer and are to file a status report on March 4, 2021 proposing a schedule for entry by the Court.

Date: February 28, 2021

                                                                                              MATTHEW F. KENNELLY
                                                                                              United States District Judge